## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| LORI A. KNIGHT, | ) | CASE NO. 4:08CV3208 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | ORDER |
| | ) | |
| MICHAEL J. ASTRUE, Commissioner | ) | |
| of the Social Security Administration, | ) | |
| | ) | |
| Defendant. | ) | |

This matter comes before the Court on the denial of two applications the Plaintiff made under the Social Security Act, one for disability insurance benefits under Title II of the Social Security Act ("Act"), 42 U.S.C. §§ 401 *et seq.*, and one for Supplemental Security Income ("SSI") benefits based on disability under Title XVI of the Act, 42 U.S.C. §§ 1381 *et seq.*  Section 205(g) of the Act, 42 U.S.C. § 405(g), provides for judicial review of a final decision of the Commissioner of the Social Security Administration ("SSA") under Title II. Section 1631(c)(3) of the Act, 42 U.S.C. § 1383(c)(3), provides for judicial review of final decisions of the Commissioner in Title XVI claims.

### PROCEDURAL BACKGROUND

The Plaintiff, Lori A. Knight ("Knight"), filed applications for disability insurance benefits under Title II of the Act on September 27, 2004 (Filing No. 13, Transcript ("Tr.") at 23) and for SSI benefits under Title XVI of the Act on September 8, 2004. (Tr. at 24.) Knight alleges an onset of disability date of August 19, 2003. (Tr. at 439.) The SSA denied her disability and SSI applications initially on January 4, 2005, (Tr. at 46-50) and again on reconsideration on June 16, 2005. (Tr. at 40-44.)  Knight filed a request for an administrative hearing on August 10, 2005. (Tr. at 38.)  Thereafter, the SSA held an

administrative hearing before an Administration Law Judge ("ALJ") on October 24, 2007. (Tr. at 26 and 434.)

On February 12, 2008, the ALJ issued his decision (Tr. at 10-22), wherein he found that Knight did not suffer from a "disability," as defined in the Act. (Tr. at 22.)  On April 16, 2008, Knight requested review of this decision by the Appeals Council. (Tr. at 433.)  The Appeals Council denied her request for review on August 8, 2008. (Tr. at 6-9.)  Thus, the ALJ's decision stands as the final decision of the Commissioner of Social Security.

## FACTUAL BACKGROUND

Knight was born on January 31, 1961 (Tr. at 65), and was forty-six years old at the time of the hearing. (Tr. at 439.)  In her applications, Knight asserted she suffered a disability from parascapular/myofascial dysfunction. (Tr. at 68.) On October 24, 2007, the date of the administrative hearing, Knight stood 5'4" tall, weighed 220 pounds, and was forty-six years old. (Tr. at 439.)

Knight first saw Rosalinda Pineiro, M.D., on February 18, 2003, for back and shoulder pain. (Tr. at 203)  Dr. Pineiro reported that Knight had been treated for a work-related injury that she sustained to her right shoulder while working in Fort Collins, Colorado, at Country General City Farm. (Tr. at 203.)  The doctor noted that as a result of this injury, Knight had permanent restrictions to not lift or push over thirty pounds especially, above her head. (Tr. at 203.) Dr. Pineiro listed Knight's current medications as: "Bextra, antiinflammatory, 10 mg two times a day; Flexeril, muscle relaxant, one pill two times a day; Ultram, pain medication, one pill three to four times a day and Amitriptyline to sleep, not for depression, 50 mg at bedtime." (Tr. at 203.)

2

Knight returned to see Dr. Pineiro again on September 12, 2003. (Tr. at 193.)  At that time, Knight reported she had been out of state for the month of August because her father had a stroke, and, consequently, she had discontinued taking her medications because she had not been able to get them refilled. (Tr. at 193.)  Knight said she had severe pain in her shoulder and in the thoracic area and was seeking to be reevaluated so she could refill her medications. (Tr. at 193.)  Upon physical exam, Dr. Pineiro noted that impingement sign was present. (Tr. at 193.)  She gave Knight a Toradol shot (50 mg.) and refilled her medications. (Tr. at 193.)  Dr. Pineiro noted in her chart that "[b]ased on this evaluation and based on the fact that I saw her in the month of July, it seems that the patient cannot maintenance [sic] maximal medical improvement without her medication." (Tr. at 193.)

Upon request, Dr. Pineiro completed a form for the Colorado Department of Human Services in which she checked a box stating: "I find this individual is not totally disabled but does have a physical or mental impairment that substantially precludes this person from engaging in his/her usual occupation. This condition has been or will be for a period of six (6) months or longer." (Tr. at 189.)  Dr. Pineiro continued to note, under Prognosis, that the impairment would last twelve months or longer, with no lifting over thirty pounds and no pushing over thirty pounds. (Tr. at 190.)

On November 19, 2004, Knight saw A. James Fix, Ph.D., for a psychological examination. (Tr. at 307.)   Dr. Fix noted that Knight "shows a vibrant, infectious, personality, with lots of jokes and laughter, even though at the same time, she shows almost constant pain-movements . . . she shows a very, very strong and buoyant personality, but she does seem now in notable ongoing pain." (Tr. at 307.)  Knight told Dr.

3

Fix that although she had been using marijuana three to four times a week socially, she had recently quit. (Tr. at 309.)  Based on his evaluation, Dr. Fix opined that Knight could sustain concentration and attention, understand instructions, work under ordinary supervision, relate appropriately to others, and adapt to changes (Tr. at 311.)

On November 22, 2004, Knight saw Jennifer Lynn King, M.D., from the Disability Determination Services ("DDS"), for a physical examination. (Tr. at 313.) Dr. King reported:

> She does not have any pain to percussion over the vertebral body. She had significant pain to palpation along the paraspinous muscles of the cervical, thoracic, and lumbar region. She also had pain to palpation along the trapezius. She has slightly decreased range of motion of the cervical and lumbar spine secondary to complaints of pain.

(Tr. at 315.)  Dr. King reasoned that Knight's symptoms were the result of back pain, specifically musculoskeletal/myofascial pain. (Tr. at 316.)

On January 3, 2005, Donald Faram, M.D., a state agency physician, completed a non-examining residual functional capacity assessment (Tr. at 152–61).  He listed Knight's impairments as myofascial pain and mild degenerative changes of the thoracic spine. (Tr. at 152.) Dr. Faram opined that Knight could lift twenty pounds occasionally and ten pounds frequently, and could sit, stand, or walk for about six total hours in an eight-hour workday. (Tr. at 153.)  He also opined that Knight could only perform reaching motions with her left arm. (Tr. at 155).  He finally concluded that she has "tenderness in the paravertebral thoracic area, T9-10[,] . . . . [and] significant pain over the paraspinous muscles of C-Spine, T-spine and L-spine." (Tr. at 160.)

Rebecca Braymen, Ph.D., completed a psychiatric review technique form on January 3, 2005 (Tr. at 162 and 165).  She opined that Knight's depression was not severe. (Tr. at 162.)

4

On January 14, 2005, Knight saw Donald Wirth, M.D., for her continuing symptoms. (Tr. at 368.)  They discussed her chronic back pain and the goal of decreasing her usage of Tramadol. (Tr. at 368.)  Dr. Wirth recommended that Knight see Dr. Skiba for a second opinion regarding pain management. (Tr. at 366-367.)

Knight subsequently saw Grzegorz Skiba, M.D., on February 7, 2005. (Tr. at 356-357.)  After physically examining Knight, Dr. Skiba noted:

> Cervical spine - no abnormalities. Thoracic spine - mild tenderness overlying the right side of the midline at the thoracic levels between T4 and T7. Palpation of the rib attachment 4 through 7 are very painful and the muscles overlying those attachments seem to be very tense and they create quite asymmetrical view of the posterior aspects of the thoracic back.  Palpation of the involved ribs provokes the pain, radiation to the anterior portion of the chest.  Assuming the upright position relieves the pain to some extent, slumping down exacerbates the pain. Lumbar spine - no abnormalities."

(Tr. at 356.)  Consequently, Dr. Skiba reasoned that Knight would need "a thoracic paravertebral block followed by physical therapy." (Tr. at 357.)

When Knight returned to see Dr. Skiba on February 23, 2005, Dr. Skiba noted that the thoracic parabertebral block injection he had given her resulted in complete pain relief for one week, but the pain had since returned. (Tr. at 352.)  Because the pain continued to return following one to three weeks after each injection, Dr. Skiba repeated the right thoracic paravertebral block injection on March 3, 2005 (Tr. at 349), on March 21, 2005 (Tr. at 346), and on April 19, 2005 (Tr. at 344).  On April 19, 2005, Dr. Skiba noted that he had "performed a thoracic paravertebral block a few weeks ago and the most recent one had given the patient a full two weeks of complete pain relief." (Tr. at 344.)  Thus, the doctor reasoned that with each injection, the pain relief seemed to last longer. (Tr. at 344.)  Dr. Skiba gave her another injection on May 16, 2005. (Tr. at 339.)

5

On February 10, 2005, Knight began physical therapy treatment at Grand Island Physical Therapy & Sports Clinic. (Tr. at 333.)  On that date, the Clinic observed that Knight was "extremely tender to palpation along the spinous process T3 to approximately T12." (Tr. at 333.)  The Clinic further reported that Knight was "also tender to palpation immediately right of the spinous process for the same length of time & there is a noticeable band of increased tone wrapping around the chest wall at the same level." (Tr. at 333.) The Clinic assessed Knight with "[c]hronic pain in the mid back & chest wall region[,] [m]uscular spasm in the mid back region[, and p]ostural syndrome." (Tr. at 334.)

Following the initial therapy, Knight reported excellent improvement on March 8, 2005 (Tr. at 329), but increased aggravation of her symptoms on March 15 and 17, 2005. (Tr. at 328.)  She noted improvements during her visits on March 31, 2005 (Tr. at 326) and April 5, 2005. (Tr. at 325.)  On her last visit on May 10, 2005, her pain had escalated over the past week and she rated it as an 8/10. (Tr. at 320.)  She stated that she did not think the shots or therapy were helping. (Tr. at 320.)  She was allowed to use a TENS unit outside the clinic for daily use and felt this would greatly help her.[1] (Tr. at 320.)

When Knight saw Dr. Wirth on May 17, 2005, he noted that her "chronic thoracic back pain [was] now of five years duration." (Tr. at 362.)  The doctor continued, stating that Knight "was thoroughly evaluated and not a surgical candidate, so the focus of treatment [was] simply pain control followed both by us and Dr. Skiba who has now done I believe

---

[1]

 A transcutaneous electrical nerve simulator, or TENS unit, is "is "thought to work by 'overriding' or blocking the transmission of pain signals from the body to the brain." Johns Hopkins Med., *Pain Treatment Program*, www.hopkinsmedicine.org/Psychiatry/pain/handout_dm.pdf at pg. 3 (last visited July 16, 2009).

6

four thoracic paravertebral injections." (Tr. at 363.)  At that time, the Dr. Wirth's treatment plan included: 1) continue every effort to minimize her pain; 2) continue working with Dr. Skiba; 3) increase the Ultram back to two tabs. q.i.d., #248 with two refills; and 4) the option of Neurontin. (Tr. at 363.)

Knight returned to see her treating physician again on July 6, 2005. (Tr. at 395.) At that time, Dr. Wirth reported that "Dr. Skiba apparently does not plan any more thoracic blocks as they don't seem to be improving her status. She does have a TENS unit in place. Her pain waxes and wanes, but for the most part her pain relief is not satisfactory." (Tr. at 395.)  He added a prescription for Neurontin. (Tr. at 395.)  On August 23, 2005, Knight indicated that the Neurontin had improved her pain situation somewhat. (Tr. at 393.)  On October 10, 2005, when she saw Dr. Wirth, Knight reported hand and feet swelling. (Tr. at 392.)  Dr. Wirth observed that Knight "says that she is a very active lady.  She doesn't stay at home because of her back pain. She walks frequently." (Tr. at 392.)

During a physical examination on November 22, 2005, Dr. Wirth noted that Knight "doesn't have any exquisite pain to palpation of the midback area either.  It's more tender with movement. It is tender if I firmly percuss the area in the back." (Tr. at 391.)  His assessment was "[c]hronic pain syndrome -- mid back radiating in to the sternum." (Tr. at 391.)  In an effort to treat her ongoing symptoms, he increased her Amitriptyline and her Neurontin. (Tr. at 391.)  Then on December 13, 2005, Dr. Wirth increased her Neurontin from 2,700 mg to 3,600 mg daily and re-instituted Daypro. (Tr. at 390.)

On February 13, 2006, Dr. Wirth noted that since he had last seen Knight, "Dr. Skiba changed her Neurontin to Lyrica and did a parathoracic nerve block." (Tr. at 388.)  Knight reported pretty good relief with that for about three weeks, but then her pain

7

returned. (Tr. at 388.)  Dr. Wirth renewed her prescription for Percocet. (Tr. at 388.)  When Knight saw Dr. Wirth on April 25, 2006, he noted that since Knight had last "had another thoracic paravertebral block by Dr. Skiba, [she] got a couple of weeks of relief from that. . . . Pain is now back just as bad as ever." (Tr. at 387.)  His assessment was: "[c]hronic back pain with chronic dependence on multiple meds, including narcotics." (Tr. at 386.)  He further stated, "I am to the point with her where we have exhausted most other medical interventions. I would question whether we may want to convert her to chronic methadone therapy." (Tr. at 386.)

On May 31, 2006, Dr. Wirth had a brief consult with Knight regarding conversion from Percocet to Methadone therapy.  At that time, he started her on Methadone 5 mg. t.i.d. (Tr. at 386.)  Knight subsequently saw Dr. Wirth on June 8, 2006, when the doctor noted that his plan was to "[c]ontinue to follow her for her chronic pain syndrome, manifest as chronic back pain . . . [since] she is now dependent on narcotics to function." (Tr. at 385.)  He increased her Methadone dose from 5 mgs t.i.d. to 10 mgs b.i.d. (Tr. at 385.)

On June 22, 2006, Knight tested positive for cannabinoids. (Tr. at 400.)

On May 31, 2007, Dr. Wirth wrote a letter, stating that Knight "is a 45-year-old female, chronically disabled due to a work comp injury several years ago. She requires daily doses of very strong pain medications to control things reasonably well.  As a result of this, it is my opinion that this situation prevents her from seeking gainful employment." (Tr. at 376.)

Knight saw Dr. Skiba on December 31, 2005. (Tr. at 417.) Following a physical examination, Dr. Skiba noted: "Provocative maneuvers are positive for costo-vertebral facet dysfunction at T3, T4, T5, T6, and T7 on the right." (Tr. at 417.) On January 18, 2006, Dr.

8

Skiba performed a thoracic paravertebral block. (Tr. at 415.)  On February 15, 2006, he performed another thoracic paravertebral block. (Tr. at 413.)  At that time, Knight was taking Oxycocone-Acetaminophe, Oxaprozin, Lyrica, Amitriptyline HC1, and Tramadol, HC1. (Tr. at 414.)  Dr. Skiba gave her additional injections on March 15, 2006 (Tr. at 411) and on May 4, 2006. (Tr. at 409.)  On August 21, 2006, Dr. Skiba noted that "[p]rovocative maneuvers are positive for costo-vertebral facet dysfunction at T7 and T8 on the left as well as T7 and T8 on the right." (Tr. at 408.)

When Dr. Skiba saw Knight on December 15, 2006, he performed another physical examination and reported that the "[e]xamination of the thoracic spine reveals pain. Provocative maneuvers are positive for thoracic facet dysfunction at T3-T4, T4-T5, T5-T6, T6-T7, T7-T8 AND T8-T9 on the right." (Tr. at 406.)  Consequently, Dr. Skiba gave the Plaintiff another injection in her back on March 2, 2007. (Tr. at 405.)

In completing a Medical Source Statement form, (Tr. at 423-426) Dr. Wirth reported that Knight "has chronic continuous pain in her mid-back, worse with activity. Relieved with pain medication to a partial extent. ... We then followed her by our focus primarily on attempting to work with her and with a chronic pain specialist in Grand Island to simply allow her to function day-to-day." (Tr. at 420.)  Dr. Wirth further noted that Knight subjectively "complained of pain with back flexion and back rotation[, and] . . . she is visibly uncomfortable with those motions." (Tr. at 420.)  As a result of her chronic back pain, Dr. Wirth indicated that Knight would need a job that permitted shifting positions at will from sitting, standing or walking. (Tr. at 421.)  Regarding how often she would be likely to miss work as a result of her impairment or treatment, he indicated that it was very difficult to estimate, but reasoned it would be once or twice a month. (Tr. at 421.)  Dr. Wirth further

9

opined that Knight could sit for four hours out of an eight hour workday; and could stand/walk for four hours out of an eight hour workday. (Tr. at 421.)  In response to Question 16, he indicated that Knight could occasionally lift eleven to twenty pounds and frequently lift one to ten pounds. (Tr. at 421.)

## ADMINISTRATIVE HEARING

Knight testified at the administrative hearing before the ALJ on October 24, 2007. (Tr. at 434.)  She said that she was "on some heavy-duty pain medications for pain" and couldn't "sit real well." (Tr. at 443.)  She further stated that she couldn't "stand real well for very long." (Tr. at 443.)  She stated that she lost her "thoughts and sentences from the side effects of the drugs" she took to control her pain. (Tr. at 443.)  She reported getting "depressed pretty easy, pretty severely at times." (Tr. at 443.)  She also explained that she experienced "[m]uscle spasms and pain, shooting pain" such that she could not "sit or stand comfortable [sic]." (Tr. at 446.)  To relieve this pain, she testified that she lay on a heating pad three or four times a day at least for twenty minutes to a half-hour. (Tr. at 447.)  Knight stated that the pain medication curbed her pain, but "does not take it away." (Tr. at 448.)

At the hearing, Knight testified that her doctors had to give her stronger medication to control the pain. (Tr. at 448.)  She also testified that she received epidural injections in her back for pain every three to six months. (Tr. at 448.)  Regarding the effectiveness of the injections, she reported that "[t]hey did pretty good for a couple, two or three weeks and then they would wear off.  It was never strong enough to take away the medications, but it did help quite a bit." (Tr. at 449.)  Knight reasoned that during an eight hour workday, she could be on her feet for three or perhaps four hours, and could sit for two to three hours.

10

(Tr. at 453.)  She testified that her pain kept her from standing or sitting longer than that. (Tr. at 453.)

When questioned about her positive test for marijuana, she stated she tested positive because she "tr[ied] it one time." (Tr. at 458.)

The ALJ asked the vocational expert ("VE") to consider a hypothetical claimant with Knight's limitations according to Dr. Wirth's medical opinions, with the exception that the proposed hypothetical claimant could "in an eight hour day, sit for six hours or stand for six hours." (Tr. at 460.)  The VE concluded that such a hypothetical claimant could perform Knight's past jobs of cashier, cleaner, and bar waitress. (Tr. at 461.)  The VE also opined that such an individual could perform other jobs, including production assembler and hand packager. (Tr. at 461–62.)

On February 12, 2008, the ALJ issued his decision (Tr. at 10-22), wherein he found that Knight was not disabled under the Act. (Tr. at 22.)

## STANDARD OF REVIEW

In reviewing a decision to deny disability benefits, a district court does not re-weigh evidence or the credibility of witnesses or revisit issues *de novo*.  *Bates v. Chater*, 54 F.3d 529, 532 (8th Cir. 1995) ("As we have stated many times, we do not reweigh the evidence presented to the ALJ."); *Harris v. Shalala,* 45 F.3d 1190, 1193 (8th Cir. 1995) (holding that the district court does not "reweigh the evidence or try the issues de novo.").  Rather, the district court's role under 42 U.S.C. § 405(g) is limited to determining whether substantial evidence in the record as a whole supports the Commissioner's decision. *Id.*

11

"Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a decision." *Juszczyk v. Astrue*, 542 F.3d 626, 631 (8th Cir. 2008) (quoting *Kirby v. Astrue*, 500 F.3d 705, 707 (8th Cir. 2007). The Court must consider evidence that both detracts from, as well as supports, the Commissioner's decision. *Finch*, 547 F.3d at 935. As long as substantial evidence supports the Commissioner's decision, that decision may not be reversed merely because substantial evidence would also support a different conclusion or because a district court would decide the case differently. *Id.* ("If, after review, we find it possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, we must affirm the denial of benefits.") (quoting *Mapes v. Chater*, 82 F.3d 259, 262 (8th Cir.1996)).

The SSA has promulgated a sequential process to determine whether a claimant qualifies for disability benefits. *See* 20 C.F.R. § 404.1520(a) (1998); *Cox v. Apfel,* 160 F.3d 1203, 1206 (8th Cir. 1998). Under the Commissioner's regulations, the determination involves a step-by-step analysis of the claimant's current work activity, the severity of the claimant's impairments, the claimant's RFC and his or her age, education and work experience. 20 C.F.R. § 404.1520(a); *Flanery v. Chater,* 112 F.3d 346, 349 (8th Cir. 1997). The Commissioner determines: (1) whether the claimant is presently engaged in a "substantial gainful activity"; (2) whether the claimant has a severe impairment—one that significantly limits the claimant's physical or mental ability to perform basic work activities; (3) whether the claimant has an impairment that meets or equals a presumptively disabling impairment listed in the regulations; (4) whether the claimant has the residual functional

12

capacity to perform his or her past relevant work; and (5) if the claimant cannot perform the past work, the burden shifts to the Commissioner to prove that there are other jobs in the national economy that the claimant can perform. *Cox*, 160 F.3d at 1206. "When determining whether a claimant can engage in substantial employment, an ALJ must consider the combination of the claimant's mental and physical impairments." *Lauer v. Apfel*, 245 F.3d 700, 703 (8th Cir. 2001).

At step three of the sequential evaluation, if the claimant is found to suffer from an impairment that is listed in the Appendix to 20 C.F.R. Part 404, Subpart P ("the listings") or is equal to such a listed impairment, the claimant will be determined disabled without consideration of age, education, or work experience. *Flanery,* 112 F.3d at 349. The listings specify the criteria for impairments that are considered presumptively disabling. 20 C.F.R. §§ 404.1525(a), 404.1520(d); 20 C.F.R. Pt. 404, Subpt. P, App. 1.

Thus, in reviewing the ALJ's determinations at each step in his sequential evaluation of Knight's application, the Court will uphold the Commissioner's final decision "if it is supported by substantial evidence on the record as a whole." *Finch v. Astrue*, 547 F.3d 933, 935 (8th Cir. 2008).

### LAW & ANALYSIS

In her appeal of the ALJ's decision, Knight argues that the ALJ committed reversible error when he failed to afford substantial weight to the medical opinions of her treating physician, Dr. Wirth. Additionally, Knight contends that the ALJ's determination that her subjective statements of pain were not credible is not supported by the substantial evidence in the record. For reasons discussed in greater detail below, the Court concludes

that the ALJ's decision to disregard the medical opinions of Knight's treating physician, Dr. Wirth, is not supported by substantial evidence in the record. The Court, however, finds that substantial evidence in the record does support the ALJ's determination that Knight's own subjective statements are not credible. Consequently, the court reverses and remands the final decision of the Commissioner for further proceedings consistent with the Court's findings within this memorandum and order.

### 1.   The Medical Opinions of Knight's Treating Physician, Dr. Wirth

Upon review of the record, the Court finds that the ALJ's failure to afford substantial weight to the medical opinions of Knight's treating physician, Dr. Wirth, constitutes reversible error. This is because "[t]he opinion of a treating physician is accorded special deference under the social security regulations." *Prosch v. Apfel*, 201 F.3d 1010, 1012 (8th Cir. 2000). "A treating physician's opinion should not ordinarily be disregarded and is entitled to substantial weight." *Singh v. Apfel*, 222 F.3d 448, 452 (8th Cir.2000). "If a treating physician's opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record, the opinion should be given controlling weight." *Krogmeier v. Barnhart,* 294 F.3d 1019, 1023 (8th Cir. 2002).

In the present case, Dr. Wirth's opinions are well-supported by the medical evidence in the record and the ALJ failed to demonstrate that the medical opinions were inconsistent with the substantial evidence in the record as a whole. Furthermore, "whether the ALJ grants a treating physician's opinion substantial or little weight, the regulations also provide that the ALJ must 'always give good reasons' for the particular weight given to a treating

14

physician's evaluation." *Singh*, 222 F.3d at 452 (citing 20 C.F.R. § 404.1527(d)(2)). In dismissing Dr. Wirth's medical opinions, the ALJ failed to give a "good" reason for doing so.

The ALJ specifically dismissed Dr. Wirth's medical opinion that Knight could not sit for more than four hours out of an eight hour workday, and could stand/walk for only four hours out of an eight hour workday. (Tr. at 18 and 421.[2])  In dismissing this medical-opinion evidence from Knight's treating physician, the ALJ reasoned that Dr. Wirth's medical opinion was not entirely reliable because Dr. Wirth had "no 'objective' findings to support" his medical assessment. (Tr. at 18.)  The ALJ concluded he would not afford Dr. Wirth's medical opinions substantial weight because Dr. Wirth could cite "no specific clinical or laboratory findings to support his conclusions . . . [and] "has not been able to find any 'objective' evidence of pain." (Tr. at 19.)  The ALJ also reasoned that Dr. Wirth's medical assessment of Knight's limitations should be dismissed because "there has been no evidence of muscle spasm, muscle atrophy, muscle weakness or sensory deficits." (Tr. at 18.)

The ALJ's characterization of the medical evidence as lacking any objective foundation is not supported by the substantial evidence in the record as a whole.  In contrast to the ALJ's conclusion, the record contains numerous examples of objective findings that substantiate Dr. Wirth's medical assessment of Knight's restrictions during an eight hour workday.  For instance, in November of 2004, Dr. King's objective findings

---

[2] In dismissing Dr. Wirth's medical opinion regarding Knight's limitations during an eight hour workday, the ALJ adopted the opinion of Dr. Faram, the state agency physician who performed only a consultative examination. (*See* Tr. At 153.)

15

regarding Knight's pain included the observation that Knight "had significant pain to palpation along the paraspinous muscles of the cervical, thoracic, and lumbar region. She also had pain to palpation along the trapezius." (Tr. at 315.) Another state agency doctor, Dr. Faram, performed a consultative examination and observed that Knight had "tenderness in the paravertebral thoracic area, T9-10[,] . . . . [and] significant pain over the paraspinous muscles of C-Spine, T-spine and L-spine." (Tr. at 160.) Dr. Skiba, after physically examining Knight, noted:

> Cervical spine - no abnormalities. Thoracic spine - mild tenderness overlying the right side of the midline at the thoracic levels between T4 and T7. Palpation of the rib attachment 4 through 7 are very painful and the muscles overlying those attachments seem to be very tense and they create quite asymmetrical view of the posterior aspects of the thoracic back. Palpation of the involved ribs provokes the pain, radiation to the anterior portion of the chest. Assuming the upright position relieves the pain to some extent, slumping down exacerbates the pain. Lumbar spine - no abnormalities."

(Tr. at 356.)

On February 10, 2005, staff at the Clinic where Knight underwent physical therapy observed that Knight was "extremely tender to palpation along the spinous process T3 to approximately T12." (Tr. at 333.) The Clinic staff further reported that Knight was "also tender to palpation immediately right of the spinous process for the same length of time & there is a noticeable band of increased tone wrapping around the chest wall at the same level." (Tr. at 333.) The Clinic staff assessed Knight with "[c]hronic pain in the mid back & chest wall region[,] [m]uscular spasm in the mid back region[, and p]ostural syndrome." (Tr. at 334.)

Knight saw Dr. Skiba on December 31, 2005. (Tr. at 417) After a physical examination, Dr. Skiba noted: "Provocative maneuvers are positive for costo-vertebral facet

dysfunction at T3, T4, T5, T6, and T7 on the right." (Tr. a 417.)  On August 21, 2006, Dr. Skiba noted that "[p]rovocative maneuvers are positive for costo-vertebral facet dysfunction at T7 and T8 on the left as well as T7 and T8 on the right." (Tr. at 408.)  When Dr. Skiba saw Knight on December 15, 2006, he performed another physical examination, and reported that the "[e]xamination of the thoracic spine reveals pain.  Provocative maneuvers are positive for thoracic facet dysfunction at T3-T4, T4-T5, T5-T6, T6-T7, T7-T8 AND T8-T9 on the right." (Tr. at 406.)

All of the aforementioned evidence constitutes substantial evidence in the record that corroborates Dr. Wirth's medical assessment of Knight's condition.  The ALJ's conclusion that no objective medical evidence supports Dr. Wirth's medical assessment is directly contradicted by evidence from several physicians, both treating and consultative. Because Dr. Wirth's medical opinions are supported by the aforementioned evidence, which itself is "well-supported by medically acceptable clinical and laboratory diagnostic techniques . . . [Dr. Wirth's] opinion should be given controlling weight." *Krogmeier*, 294 F.3d at 1023.  The ALJ's failure to do so constitutes reversible error.

The ALJ, however, also reasons that Dr. Wirth's opinions are not entitled to substantial weight because "his opinions are contradicted by his own clinical finding reported on May 17, 2005, August 23, 2005, November 22, 2005, April 25, 2006[, and] June 8, 2006, when the Claimant had no tenderness of the spine except for some 'mild' tenderness at the site of a recent injection." (Tr. at 19.)  It is true that "when a treating physician's opinions are inconsistent or contrary to the medical evidence as a whole, they are entitled to less weight." *Krogmeier*, 294 F.3d at 1023.  In this case, however, the ALJ's conclusion that Dr. Wirth's own clinical findings on May 17, August 23, November 22, April

17

25, and June 8 contradict Dr. Wirth's own medical assessment is not supported by the substantial evidence in the record.

The substantial evidence in the record demonstrates that immediately preceding each of the listed dates, Knight received injections, specifically thoracic parabertebral blocks, from Dr. Skiba.  Each time Knight received an injection, her symptoms temporarily dissipated, only to return after one to three weeks. (*See, e.g.,* Tr. at 339, 344, 346, 349, 352, 387, and 388.)  Thus, the substantial evidence on record supports Dr. Wirth's medical assessment that the injections provided Knight with temporary relief, but failed to alleviate her symptoms over a longer period of time.  The fact that Dr. Wirth's clinical findings note the temporary absence of tenderness in Knight's spine following each injection only further *validates* the conclusion that Dr. Wirth's opinions are consistent with the entire medical record, and therefore entitled to substantial weight. *See Krogmeier*, 294 F.3d at 1023 (where the treating physician's medical opinion "is not inconsistent with the other substantial evidence in the record, the opinion should be given controlling weight.").

Finally, the ALJ dismissed Dr. Wirth's medical finding that Knight could not sit for more than four hours and could stand/walk for only four hours because the ALJ determined that this medical evidence was not "generally consistent with the opinions of a medical consultant employed by the State Disability Determinations Services." (Tr. at 18.)  Such a conclusion, however, constitutes reversible error.  "'As a general matter, the report of a consulting physician who examined a claimant once does not constitute substantial evidence upon the record as a whole, especially when contradicted by the evaluation of

18

the claimant's treating physician.'"[3] *Wagner v. Astrue*, 499 F.3d 842, 850 (8th Cir. 2007) (internal quotations omitted).  Thus, the ALJ erred when he dismissed Dr. Wirth's medical assessment and instead adopted the opinion of the consultative state agency physician, Dr. Faram, concluding that Knight could sit for six hours and sit/walk for six hours in an eight hour workday. (*See* Tr. at 153 and 421.)

The Court further notes that as a result of this error, the ALJ's findings based on the VE's response to the ALJ's hypothetical also constitute reversible error.  Any hypothetical posed to the VE in the present case must include Dr. Wirth's medical assessment of Knight's limitations during the eight hour workday. *See Pickney v. Chater*, 96 F.3d 294, 297 (8th Cir. 1996)("It has long been the rule in this circuit that a hypothetical question posed to an ALJ must contain all of claimant's impairments that are supported by the record.").  Because the VE''s current response to the ALJ's hypothetical (Tr. at blah) fails to take into account all of Knight's limitations, the VE's current conclusion that Knight can perform her past jobs is not supported by the substantial evidence in the record.

For the aforementioned reasons, the Court finds that the substantial evidence in the record demonstrates that the medical opinions of Knight's treating physician are entitled

---

[3] The Court notes that the *Wagner* Court found two exceptions to this rule: "We have upheld an ALJ's decision to discount or even disregard the opinion of a treating physician (1) where other medical assessments are supported by better or more thorough medical evidence, or (2) where a treating physician renders inconsistent opinions that undermine the credibility of such opinions." *Wagner v. Astrue*, 499 F.3d 842, 849 (8th Cir. 2007).  In the present case, however, the objective medical evaluations in the record support Dr. Wirth's medical opinions, and there is no evidence of inconsistencies in the record that would undermine his credibility.  Accordingly, the medical opinions of consultative state agency doctors are not entitled to more weight that the medical opinions of Knight's treating physician.

to substantial weight.  Consequently, the Court concludes that the ALJ's decision to disregard the medical opinions of Dr. Wirth constitutes reversible error.  The Court reverses and remands the final decision of the Commission for further proceedings in accordance with this memorandum and order.

### 2.    The ALJ's Credibility Determination

Knight also contends that the ALJ erred when he determined that her subjective statements regarding her pain were not credible.  The Court has reviewed the final decision and finds that substantial evidence in the record does support the ALJ's determination that Knight's testimony is "not credible." (Tr. at 21.)  As a result, the Court is not remanding the final decision of the ALJ for any further consideration of Knight's subjective statements.

In making an RFC determination, the ALJ is required to consider the "claimant's own descriptions of his limitations." *Pearsall*, 274 F.3d at 1217-1218.  Such consideration is required unless the ALJ makes a proper credibility determination and finds that a plaintiff's statements regarding his own pain are not credible.   In the Eighth Circuit, *Polaski v. Heckler* stands as the guide for all credibility determinations:

> While the claimant has the burden of proving that the disability results from a medically determinable physical or mental impairment, direct medical evidence of the cause and effect relationship between the impairment and the degree of claimant's subjective complaints need not be produced. The adjudicator may not disregard a claimant's subjective complaints solely because the objective medical evidence does not fully support them.
>
> The absence of an objective medical basis which supports the degree of severity of subjective complaints alleged is just one factor to be considered in evaluating the credibility of the testimony and complaints. The adjudicator must give full consideration to all of the evidence presented relating to subjective complaints, including the claimant's prior work record, and observations by third parties and treating and examining physicians relating to such matters as:

20

　　　　1. the claimant's daily activities;
　　　　2. the duration, frequency and intensity of the pain;
　　　　3. precipitating and aggravating factors;
　　　　4. dosage, effectiveness and side effects of medication;
　　　　5. functional restrictions.

　　　　　　The adjudicator is not free to accept or reject the claimant's subjective complaints *solely* on the basis of personal observations. Subjective complaints may be discounted if there are inconsistencies in the evidence as a whole.

*Polaski v. Heckler,* 739 F.2d 1320, 1322 (8th Cir. 1986).

　　　　Consequently, an ALJ is required to make an "express credibility determination" when discrediting a social security claimant's subjective complaints. *Lowe v. Apfel,* 226 F.3d 969, 971-72 (8th Cir. 2000).   The ALJ, however, is "not required to discuss methodically each *Polaski* consideration."  *Id.* at 972.  Deference is generally granted to an ALJ's determination regarding the credibility of a claimant's testimony.  *Dunahoo v. Apfel,* 241 F.3d 1033, 1038 (8th Cir. 2001) (stating that if an ALJ provides a "good reason" for discrediting claimant's credibility, deference is given to the ALJ's opinion, "even if every factor is not discussed in depth.").

　　　　Upon review of the record, the Court finds that the ALJ has given several "good reason[s]" for discrediting Knight's credibility.  As one of his reasons for discrediting Knight's subjective statements, the ALJ cites Knight's noncompliance in taking her pain medication. (Tr. at 21.)  Evidence of this noncompliance is supported by substantial evidence in the record, as Knight once went an entire month without taking her medication. (Tr. at 193.)   Such noncompliance can serve as a basis for dismissing a claimant's subjective complaints, *see Guziewicz v. Barnhart*, 114 Fed. Appx. 267, 269 (8th Cir.2004) (holding that where claimant "had been noncompliant with prescribed medical treatment,"

21

ALJ was justified in determining that claimant's subjective statements were not credible); *Holley v. Massanari*, 253 F.3d 1088, 1092 (8th Cir.2001) (holding that an ALJ may consider noncompliance with medical treatment in his decision to dispense with claimant's subjective complaints); *see also* 20 C.F.R. § 404.1530(b) ("If you do not follow the prescribed treatment without good reason, we will not find you disabled.").

Furthermore, the substantial evidence on record supports the ALJ's credibility determination because Knight's statements regarding her problems with drug abuse are inconsistent with the record as a whole, undermining her credibility.  In his decision to dismiss Knight's credibility, the ALJ cited Knight's inconsistent statements regarding her positive test for marijuana use, noting that Knight seemed "not very worried about this . . . laboratory testing on June 22, 2006[, that] was presumptively positive for cannabis." (Tr. at 21.)

On November 19, 2004, Knight told Dr. Fix that although she had been using marijuana three to four times a week socially, she had recently quit. (Tr. at 309.)  Then, on June 22, 2006, Knight tested positive for cannabinoids. (Tr. at 400.)  When questioned about her positive test for marijuana at the administrative hearing, she stated she tested positive because she "tr[ied] it one time." (Tr. at 458.)  Such inconsistent statements regarding Knight's problem with drug abuse warrant the ALJ's determination that her statements are not credible. *See Choate v. Barnhart*, 457 F.3d 865, 872 (8th Cir. 2006) (affirming the ALJ's adverse credibility determination where the ALJ noted "inconsistencies between [Knight's] testimony and the record.).  Lying about a drug test and her own patterns of drug abuse certainly provides the ALJ with sufficient reason to question the credibility of Knight's statements regarding her pain.

22

Accordingly, the Court concludes that the ALJ's credibility determination is supported by the substantial evidence in the record.  While the Court is reversing and remanding the final decision of the Commissioner, the Court is not remanding the final decision for any further consideration of Knight's own subjective statements.

**CONCLUSION**

For the aforementioned reasons, the Court reverses and remands the final decision of the Commissioner for further proceedings in accordance with this memorandum and order.

IT IS ORDERED:

1.      This matter is remanded to the Defendant, Commissioner of the Social Security Administration, pursuant to sentence four of 42 U.S.C. § 405(g) for further proceedings consistent with this Memorandum and Order; and

2.      A separate Judgment will be filed.

DATED this 21st day of July, 2009.

BY THE COURT:

s/Laurie Smith Camp
United States District Judge